**BRODSKY & SMITH, LLC**
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (310) 247-0160

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZENGHUAN SHAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>PIVOTAL SOFTWARE, INC., PAUL MARITZ, MICHAEL S. DELL, EGON DURBAN, WILLIAM D. GREEN, MARCY S. KLEVORN, MADELYN LANKTON, ROBERT MEE, ZANE ROWE, VMWARE, INC. and RAVEN TRANSACTION SUB, INC.,<br><br>Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMAND** |

Plaintiff, Zenghuan Shan ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.     Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of Pivotal Software, Inc. ("Pivotal Software" or the "Company"), against Pivotal Software, the Company's Board of Directors (the "Board" or the "Individual Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the

"Exchange Act") and breaches of fiduciary duty as a result of Defendants' efforts to sell the Company to VMware, Inc., a Delaware corporation ("Parent"), and Raven Transaction Sub, Inc., a Delaware corporation and a wholly owned subsidiary of VMware ("Merger Sub," collectively with Parent, "VMWare" and collectively with Pivotal Software and the Individual Defendants, the "Defendants") as a result of an unfair process for an unfair price, and to enjoin an upcoming stockholder vote on a proposed all-cash transaction whereby Pivotal Software stockholders will receive $15.00 for each share of the Company they own (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in an August 22, 2019 filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").   Under the terms of the Merger Agreement, Merger Sub will merge with and into Pivotal (the "Merger"), with Pivotal surviving the Merger and becoming a wholly owned subsidiary of VMware.

3.      In approving the Proposed Transaction, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell Pivotal Software without first taking steps to ensure that Plaintiff and Class members (defined below) would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or VMWare without regard for Pivotal Software public stockholders.   Accordingly, this action seeks to enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to Pivotal Software stockholders.

4.      On October 10, 2019, Defendants caused the filing of a preliminary proxy statement on PREM14A (the "Preliminary Proxy") with the United States Securities and Exchange Commission ("SEC") in support of the Proposed Transaction.

5.      In addition, the Proposed Transaction is unfair and undervalued for a number of reasons.   Significantly, the Preliminary Proxy describes an insufficient sales process in which the only end goal was an "inside" sale to other Companies wholly owned and/or completely controlled by Dell.

6.    Next, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits with no thought to the Company's public stockholders.  For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board Members and executive officers will be able to exchange all Company equity awards for the merger consideration.  Moreover, certain Directors and other insiders will also be the recipients of lucrative change-in-control agreements, triggered upon the termination of their employment as a consequence of the consummation of the Proposed Transaction.

7.    In violation of sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and in further violation of their fiduciary duties, Defendants caused to be filed the materially deficient Preliminary Proxy on October 10, 2019 with the SEC in an effort to solicit stockholders to vote their Pivotal Software shares in favor of the Proposed Transaction.  The Preliminary Proxy is materially deficient, deprives Pivotal Software stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote their shares in favor of the Proposed Transaction, and is thus in breach of the Defendants fiduciary duties.  As detailed below, the Preliminary Proxy omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular, certain conflicts of interest for management; ) (b) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisors, Morgan Stanley & Co. LLC ("Morgan Stanley"); and (c) the financial projections for Pivotal Software, provided by Pivotal Software to the Special Committee's financial advisor Morgan Stanley, to VMware's financial advisor Lazard Frères & Company LLC ("Lazard"), to Dell's financial advisors Moelis & Company LLC ("Moelis") and Goldman Sachs & Co. LLC ("Goldman Sachs")  for use in their respective financial analyses.

8.    As alleged in further detail below, both the Merger Consideration Pivotal Software stockholders will receive in connection with the Proposed Transaction and the process by which

Defendants intend to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other public stockholders of the Company.

9.    The Defendants' conduct constitutes a breach of their fiduciary duties owed to Pivotal Software's public stockholders, and a violation of applicable legal standards governing the Defendants' obligations

10.    Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from violation of the federal securities laws by Defendants.

## PARTIES

11.    Plaintiff is a citizen of Washington and, at all times relevant hereto, has been a Pivotal Software stockholder.

12.    Defendant Pivotal Software provides an integrated solution that combines a cloud-native application platform and services in the United States. Its cloud-native platform, Pivotal Cloud Foundry (PCF), accelerates and streamlines software development by reducing the complexity of building, deploying, and operating modern applications. The company also enables its customers to accelerate their adoption of a modern software development process and their business success using its platform through its strategic services, Pivotal Labs (Labs). Pivotal Software, Inc markets and sells PCF and Labs through its sales force and ecosystem partners. The company was founded in 2013. Shares of Pivotal Software common stock are traded on the NYSE under the symbol "PVTL."

13.    Defendant Paul Maritz has been a Director of the Company since 2103. He is also Chairman of the Board and previously served as CEO from 2013 - 2105. From September 2012 through March 2013, he served as Chief Strategist at DellEMC and also served as a director of VMware from July 2008, when he joined VMware as Chief Executive Officer, to December 2017. He was VMware's Chief Executive Officer from July 2008 through August 2012 and President

from July 2008 to January 2011. Prior to joining VMware, he was President of DellEMC's Cloud Infrastructure and Services Division after DellEMC acquired Pi Corporation in February 2008.

14.     Defendant Michael S. Dell has been a director of the Company since 2016. In addition, Dell also serves as a director and non-executive Chairman of the board of directors of VMware, a majority-owned subsidiary of Dell Technologies.

15.     Defendant Egon Durban has been a director of the Company since 2016. He is also a member of the Dell Board of Directors and is on the VMware Board, as well.

16.     Defendant William D. Green has been a director of the Company since 2015. Green has served as a director of Dell Technologies since September 2016. Previously, he served as a director of DellEMC from July 2013 to August 2016 and as DellEMC's independent Lead Director from February 2015 to August 2016.

17.     Defendant Marcy S. Klevorn has been a director of the Company since 2016. Ms. Klevorn has served as executive vice president and president of Mobility, Ford Motor Company ("Ford") since June 2017. In this role, she is responsible for overseeing Ford Smart Mobility LLC, which was formed to accelerate the company's plans to design, build, grow and invest in emerging mobility services, as well as Information Technology and Global Data, Insight and Analytics. Previously, Ms. Klevorn was group vice president, Information Technology and Chief Information Officer from January 2015 to January 2017. From 1983 to January 2015, Ms. Klevorn worked at various positions at Ford. Notably, concurrently with the execution of the merger agreement, on August 22, 2019, VMware entered into the voting agreement with Ford, a stockholder of Pivotal Software. Pursuant to the voting agreement, Ford, which beneficially owns 17,516,709 shares of Class A common stock representing approximately 17.6% of the outstanding shares of Class A common stock as of August 30, 2019, has agreed, among other things, to vote its shares of Class A common stock, including any shares acquired after August 22, 2019, in favor of the merger agreement proposal, and against any competing transaction so long as, among other things, the Pivotal Board has not made an adverse recommendation change

CLASS ACTION COMPLAINT

18.     Defendant Madelyn Lankton has been a director of the Company since October 2018. From 1982 until 2018, she was at The Travelers Companies, serving most recently as Senior Vice President and Chief Information Officer and a member of the Management and Operating Committees. In addition to holding a number of technology and operational leadership roles at the Travelers, she initiated a Women's Mentoring Forum for high potential women within the information technology industry and, in 2008, she was recognized with a "Women in Insurance Leadership Award" from Insurance Networking News.

19.     Defendant Robert Mee has been a director of the Company and CEO since 2015. Prior to that, he was Senior Vice President of Products and Research & Development from April 2013 to August 2015. Mee was part of Pivotal's founding team in April 2013. Prior to joining Pivotal, Mee led the Pivotal Labs Division at DellEMC, a data storage, information security, virtualization, analytics and cloud computing company, from 2012 to April 2013, where he was responsible for all aspects of the Pivotal Labs business. Prior to DellEMC, he served as Founder and Chief Executive Officer of Pivotal Labs LLC from 1989 until it was acquired by DellEMC in 2012.

20.     Defendant Zane Rowe has been a director of the Company since 2016. Rowe has served as Chief Financial Officer and Executive Vice President of VMware since March 2016. Before joining VMware, he served as Executive Vice President and Chief Financial Officer of DellEMC from October 2014 through February 2016.

21.     Defendants identified in ¶¶ 13-20 are collectively referred to as the "Individual Defendants."

22.     Defendant VMWare, Inc. provides software in the areas of hybrid cloud, multi-cloud, modern applications, networking and security, and digital workspaces in the United States and internationally. It is a Delaware corporation and has its principal place of business at 3401 Hillview Avenue, Palo Alto, CA 94304.  Its common stock is traded on the NYSE under the ticker symbol "VMW."

23.     Defendant Merger Sub is a wholly owned subsidiary of Parent created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

25.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Pivotal Software has its principal place of business is located in this District, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action individually and on behalf of all holders of Pivotal Software common stock who are being and will be harmed by the Individual Defendants' actions, described herein (the "Class").  Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

28.     Class actions are certified when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court.  Cal. Civ. Proc. Code § 382.  The California Supreme Court has stated that a class should be certified when the party seeking certification has demonstrated the existence of a "well-defined

CLASS ACTION COMPLAINT

community of interest" among the members of the proposed class. *Richmond v. Dart Indus., Inc.*, 29 Cal.3d 462, 470 (1981); *see also Daar v. Yellow Cab Co.*, 67 Cal.2d 695, 704 (1967).

29.     Class actions are especially valuable in a context such as this one, in which individual damages may be modest. It is well settled that a plaintiff need not prove the merits of the action at the class certification stage.

30.     Rather, the decision of whether to certify a class is "essentially a procedural one" and the appropriate analysis is whether, assuming the merits of the claims, they are suitable for resolution on a class-wide basis.

> As the focus in a certification dispute is on what types of questions common or individual are likely to arise in the action, rather than on the merits of the case, in determining whether there is substantial evidence to support a trial court's certification order, we consider whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.

*Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal.4th 319, 327 (2004) (citations omitted).

31.     This action is properly maintainable as a class action because, *inter alia*:

a.     The Class is so numerous that joinder of all members is impracticable. As of August 30, 2019, there were 275,217,350 shares of common stock outstanding, consisting of 99,703,078 outstanding shares of Class A common stock and 175,514,272 outstanding shares of Class B common stock. Pivotal Software stock is publicly traded on the NYSE and Plaintiff believes that there are hundreds if not thousands of holders of such shares. Moreover, the holders of these shares are geographically dispersed throughout the United States;

b.  There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. These common questions include, *inter alia*: (i) whether the Individual Defendants have engaged in self-dealing, to the detriment of Pivotal Software public stockholders; (ii) whether the Proposed Transaction is unfair to the Class, in that the price is inadequate and is not the fair value that could be obtained under the circumstances; and (iii) whether the Class is entitled to injunctive relief and/or damages as a result of the wrongful conduct committed by Defendants;

c.  Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. The claims of Plaintiff are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

d.  The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

e.   Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

**THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES**

32.    By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Pivotal Software and owe the Company the duties of due care, loyalty, and good faith.

33.    By virtue of their positions as directors and/or officers of Pivotal Software, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Pivotal Software to engage in the practices complained of herein.

34.    Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors of a corporation must:

a.   act with the requisite diligence and due care that is reasonable under the circumstances;

b.   act in the best interest of the company;

c.   use reasonable means to obtain material information relating to a given action or decision;

d.   refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

e.   avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

CLASS ACTION COMPLAINT

f.   disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

35.   In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Pivotal Software, are obligated to refrain from:

a.   participating in any transaction where the directors' or officers' loyalties are divided;

b.   participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders; and/or

c.   unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders.

36.   Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Pivotal Software, Plaintiff and the other public stockholders of Pivotal Software, including their duties of loyalty, good faith, and due care.

37.   As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Pivotal Software common stock in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

### Company Background

38.   Pivotal Software provides a cloud-native application platform and services in the United States.   Its cloud-native platform, Pivotal Cloud Foundry (PCF), accelerates and streamlines software development by reducing the complexity of building, deploying, and operating cloud-native and modern applications.   The company also enables its customers to accelerate their adoption of a modern software development process and their business success using its platform through its strategic services, Pivotal Labs (Labs).

39.     Pivotal Software was formed by EMC Corporation and VMware in April 2013.  On September 7, 2016, Dell acquired EMC Corporation.  As a result of the acquisition, Dell became Pivotal Software's majority stockholder.

40.     According to the Company's most recent Proxy statement, "Dell Technologies, Denali Intermediate Inc. and Dell Inc. may be deemed to be the beneficial owner of all of the shares of our common stock beneficially owned by EMC Corporation, including all of the shares of our common stock beneficially owned by VMware."

41.     Additionally, the most recent Proxy Statement acknowledges, "We jointly market and sell our products and services with Dell and VMware pursuant to commercial agreements with them.  While we have in the past received certain administrative services from Dell and VMware, over time we have reduced our reliance on these entities for most of these services."

42.     According to the Company's most recent Proxy statement, "Dell, as our majority stockholder, has the power, acting alone, to approve any action requiring a vote of shares representing a majority of the combined voting power of both classes of our outstanding common stock.  As long as Dell continues to control a majority of the outstanding shares of our Class B common stock and a majority of all outstanding shares of our common stock, it will be able to exercise control over all matters requiring approval by our stockholders, including the election of our directors and approval of significant corporate transactions.  Dell's controlling interest may discourage or prevent a change in control of our company that other holders of our common stock may favor.  Dell is not subject to any contractual obligation to retain any of our common stock."

43.     Additionally, VMWare owns over 44 million shares of the Company and maintains approximately 23% of total voting power.

44.     Next, the most recent Proxy statement further acknowledges the inter-connected relationship between VMWare and the Company:

*Transactions with VMware*

*Administrative Services Agreements with VMware*

CLASS ACTION COMPLAINT

1    We have a shared services and employee matters agreements with VMware.  Under

2  these agreements, VMware provides us with certain management and administrative services,

3  including routine management, administration, finance and accounting, legal and human resource

4  services.

5    VMware also charges us expenses related to administrative services such as facilities

6  and IT systems for Pivotal Software employees who worked from VMware offices.  VMware

7  provided us these services in exchange for a service fee equal to the operating costs of providing

8  the services plus a markup equal to a percentage of such operating costs.  Our expenses under these

9  agreements primarily consisted of salaries, benefits, travel and rent.  The total amounts that we

10  paid to VMware and its subsidiaries under these agreements were $0.3 million in Fiscal 2019.

11    *Sales of our Products and Services to VMware*

12    From time to time, we have sold our software products and professional, software

13  support and other services to VMware for its internal use.  Revenue recognized was $1.4 million

14  in Fiscal 2019 for sales of our products and services.

15    *Agency Agreements with VMware*

16    We have domestic and international agency agreements with VMware which enabled

17  VMware to sell our products and services leveraging the VMware enterprise relationships and its

18  end-user customer contracts.  In exchange, we pay an agency fee to VMware for these services,

19  which is based on a percentage of the invoiced contract amounts.  We paid agency fees to VMware

20  of $3.7 million in Fiscal 2019.

21    45.    The Company's recent financial performance press release before the

22  announcement of the Proposed Transaction indicated sustained and solid financial performance.

23  For example, on March 14, 2019, the Company held an earnings call to address the 4th quarter and

24  Fiscal Year 2019.  On the call, Defendant Mee stated, "I'm pleased to report that Pivotal delivered

25  a strong fourth quarter, wrapping up a successful initial year as a public company.  To summarize

26  our fiscal year results, subscription revenue grew 55% and total revenue grew 29% year over year.

27

28

Our total revenue growth was higher in fiscal 2019 than the prior year attributable to increasing workloads on our software platform."

46.     Further, the Company stated, "Our fourth quarter capped a strong year as we continue to attract new customers and as many of our existing customers grow their investments with us.  Subscription revenue generated $112.5 million in Q4 - more than $100 million for the second quarter in a row - with year-over-year subscription growth at 50%.  Q4 total revenue of $169.2 million represented growth of 27% year over year.  And, we finished our fiscal year with total revenue of $657.5 million, up 29% compared to fiscal 2018."

47.     Similarly, on the First Quarter 2020 Earnings call that took place on June 4, 2019, Defendant Mee advised that even with certain sales execution and "technology landscape" challenges, "Pivotal delivered a solid Q1 with 43% subscription growth driving total revenue growth of 19%.  Customer expansions continue to drive our revenue growth, resulting in our strong net expansion rate of 143% in the quarter.  We exited the quarter with 383 subscription customers, up 13% year-over-year, underscoring the continued demand for our platform."

48.     Most recently, the Company released its Second Quarter 2020 Financial Results. Defendant Mee stated, "Pivotal delivered a solid performance in the second quarter.  We remain focused on customer success and winning new customers with our differentiated, multi-cloud platform.  Subscription revenue growth of 38% and 17% total revenue growth were driven by customer expansions and new customer wins," "Our platform and strategic services enable enterprises to modernize their development practices and securely operate their most important applications across multi-cloud environments."

49.     These positive results are not an anomaly, but rather, are indicative of a trend of continued financial success by Pivotal Software.  Clearly, based upon these positive financial results, the Company is likely to have tremendous future success and should command a much higher consideration than the amount contained within the Proposed Transaction.

50.     Despite this upward trajectory and continually increasing financial results, the Individual Defendants have caused Pivotal Software to enter into the Proposed Transaction for insufficient consideration.

***The Flawed Sales Process***

51.     As detailed in the Preliminary Proxy, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of Company Insiders, and was designed with only one concern in mind – to effectuate a sale of the Company to VMware.

52.     Specifically, all entities involved in the Proposed Transaction are majority owned and are controlled by Dell and by Defendant Michael S. Dell, who is the controlling stockholder of Dell.

53.     In fact, as revealed by the Preliminary Proxy, it was Defendant Dell himself, who on June 18, 2019, set up a teleconference with Defendants Mee and Maritz to inform them of VMware's desire to purchase the Company.

54.     This end-goal of an eventual "in-house" sale of Pivotal Software to VMware for Dell is made apparent throughout the timeline described in the Preliminary Proxy.  Notably, the Pivotal Software special committee at no point conducts a market check, initially because they plan on seeking a "go-shop" provision in the eventual merger agreement, however such a provision failed to make its way into the final agreement.  As such, no third parties were ever contacted by, nor will they be contacted by, the Pivotal Software special committee to gauge interest in a possible outside bid.

55.     In addition the Preliminary Proxy fails to unclear as to the nature of specific nature of the confidentiality and/or non-disclosure agreement Pivotal Software entered into with VMware during the sales process, including if the terms of such included any "don't-ask, don't-waive" provisions or standstill provision, and if so, the specific conditions, if any, under which such provisions would fall away.

56.     It is not surprising, given this background to the overall sales process, that it was conducted with an obvious end-goal of a VMware transaction, with the ultimate goal of being beneficial to Dell.

**The Proposed Transaction**

57.     On November 9, 2018, VMWare and Pivotal Software issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

> PALO ALTO, Calif. , Aug. 22, 2019 (GLOBE NEWSWIRE) -- VMware, Inc. (NYSE: VMW), a leading innovator in enterprise software, and Pivotal Software, Inc. (NYSE: PVTL), a leading cloud-native platform provider, today announced that the companies have entered into a definitive agreement under which VMware will acquire Pivotal for a blended price per share of $11.71 , comprised of $15 per share in cash to Class A stockholders, and the exchange of shares of VMware's Class B common stock for shares of Pivotal Class B common stock held by Dell Technologies , at an exchange ratio of 0.0550 shares of VMware Class B stock for each share of Pivotal Class B stock. In total, the merger consideration represents an enterprise value for Pivotal of $2.7 billion.  The Board of Directors of each of VMware and Pivotal have approved this transaction, following the recommendations of special committees composed of independent directors of each company.  Following the close of the transaction, VMware will be positioned to deliver the most comprehensive enterprise-grade Kubernetes-based portfolio for modern applications.
>
> Pivotal is a technology leader that is transforming the way the world's largest companies build and run software applications.  For the last six years, Pivotal has been at the leading-edge of modern software development, helping organizations transform how they build and run their most important applications.  Pivotal offers a powerful set of assets including a leading developer-centric platform, tools and services that accelerate modern app development.  Additionally, Pivotal is a major contributor to the Spring developer framework, which sees more than 75 million downloads per month.  The company is fully embracing Kubernetes with the recent launch of Pivotal Spring Runtime for Kubernetes and the upcoming Pivotal Application Service for Kubernetes.
>
> VMware and Pivotal share a long history of collaboration and joint innovation, reflected in the co-development and launch of VMware Pivotal Container Service (PKS) in February of 2018.   VMware has increased its Kubernetes-related investments over the past year with the acquisition of Heptio, and the Kubernetes founders, to become one of the top three contributors to Kubernetes.   The combination of Pivotal's developer experience and assets with VMware's IT expertise and infrastructure will help deliver a comprehensive portfolio of products,

tools and services necessary to build, run and manage modern applications on Kubernetes infrastructure with velocity and efficiency.

"Kubernetes is emerging as the de facto standard for multi-cloud modern apps. We are excited to combine Pivotal's development platform, tools and services with VMware's infrastructure capabilities to deliver a comprehensive Kubernetes portfolio to build, run and manage modern applications," said Pat Gelsinger, CEO of VMware. "Importantly, adding Pivotal to our platform, accelerates our broader Any Cloud, Any App, Any Device vision and reinforces our leadership position in modern multi-cloud IT infrastructure."

"The time is ideal to join forces with VMware, an industry leader who shares our commitment to open source community contributions and our focus on adding developer value on top of Kubernetes," said Rob Mee, CEO, Pivotal. "VMware has a proven track record of helping organizations run and manage consistent infrastructure in support of mission critical applications, and our two companies have already built a strong foundation on our successful VMware PKS collaboration. We look forward to continuing our work with VMware to provide even more value to customers building modern applications."

"The VMware Board of Directors is committed to creating value for all stockholders," said Karen Dykstra, Chairperson of the Special Committee of VMware's Board of Directors. "After a thorough and independent evaluation with its advisors, and working closely with the VMware management team, the Special Committee recommended the Board approve this transaction with Pivotal given its strong strategic and long-term value to the company and its customers."

Details Regarding the Transaction

Under the terms of the transaction, Pivotal's Class A common stockholders will receive $15.00 per share cash for each share held, and Pivotal's Class B common stockholder, Dell Technologies , will receive approximately 7.2 million shares of VMware Class B common stock, at an exchange ratio of 0.0550 shares of VMware Class B common stock for each share of Pivotal Class B common stock. This transaction, in aggregate, results in an expected net cash payout for VMware of $0.8 billion. The impact of equity issued to Dell Technologies would increase its ownership stake in VMware by approximately 0.34 percentage points to 81.09% based on the shares currently outstanding. VMware currently holds 15 percent of fully-diluted outstanding shares of Pivotal. The transaction is expected to be funded through cash on the balance sheet, accessing short-term borrowing capacity, and approximately 7.2 million shares of VMware Class B common stock to Dell. Closing of the transaction is subject to customary closing conditions including the approval of the merger agreement by the holders of at least a majority of the outstanding shares of Pivotal common stock not owned by VMware or Dell Technologies or their affiliates (a "majority-of-the-

1
2

minority" vote) and is expected in the second half of VMware's fiscal year 2020, which ends January 31, 2020.

3

Advisors

4
5
6
7
8

J.P. Morgan Securities LLC served as financial advisor and Wilson Sonsini Goodrich & Rosati served as legal counsel to VMware.  Lazard served as financial advisor and Gibson, Dunn & Crutcher LLP served as legal counsel to the Special Committee of the VMware Board of Directors.  Davis Polk & Wardwell LLP served as legal counsel to Pivotal.  Morgan Stanley & Co. LLC served as financial advisor and Latham & Watkins, LLP served as legal counsel to the Special Committee of the Pivotal Board of Directors.

9

***The Inadequate Merger Consideration***

10
11

58.     Significantly, the Company's financial prospects and opportunities for future growth, and synergies with VMWare establish the inadequacy of the merger consideration.

12
13
14
15
16

59.     First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company.  The proposed valuation does not adequately reflect the intrinsic value of the Company.  Moreover, the valuation does not adequately take into consideration how the Company is performing, considering key financial improvements of the Company in recent years.

17
18

60.     For example, the Company has traded as high as $24.39 per share within the past fifty-two weeks and over $20 a share as recently as late May 2019.

19
20

61.     Moreover, according to *MarketBeat.com*, within the last six-months, analysts have set a consensus price target for Pivotal Software at $23.91 per share.

21
22
23
24

62.     Additionally, Pivotal Software's future success is extremely likely, given the consistent positive financial results it has posted over the past several quarters.  Obviously, the opportunity to invest in such a company on the rise is a great coup for VMWare, however it undercuts the investment of Plaintiff and all other public stockholders.

25
26

63.     Finally, the Proposed Transaction represents a significant synergistic benefit to VMWare.

27
28

CLASS ACTION COMPLAINT

64.     Clearly, while the deal will be beneficial to VMWare it comes at great expense to Plaintiff and other public stockholders of the Company.

65.     It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for VMWare at the expense of Pivotal Software stockholders, which clearly indicates that Pivotal Software stockholders were not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Mechanisms***

66.     The Merger Agreement contains certain provisions that unduly benefit VMWare by making an alternative transaction either prohibitively expensive or otherwise impossible. Significantly, the Merger Agreement contains a termination fee provision that is especially onerous and impermissible.  Notably, in the event of termination, the merger agreement requires Pivotal Software to pay up to $95 million to VMWare, if the Merger Agreement is terminated under certain circumstances.  Moreover, under one circumstance, Pivotal Software must pay this termination fee even if it consummates any competing Company Takeover Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.   The termination fee will make the Company that much more expensive to acquire for potential purchasers.  The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

67.     The Merger Agreement also contains a "No Solicitation" provision that restricts Pivotal Software from considering alternative acquisition proposals by, *inter alia*, constraining Pivotal Software's ability to solicit or communicate with potential acquirers or consider their proposals.  Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider either an Intervening Event or a Superior Proposal if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

68.     Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, the Individual Defendants agreed to provide VMWare

information in order to match any other offer, thus providing VMWare access to the unsolicited bidder's financial information and giving VMWare the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of VMWare.

69.     These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and its public stockholders.

70.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

***Potential Conflicts of Interest***

71.     The breakdown of the benefits of the deal indicate that Pivotal Software insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Pivotal Software.

72.     First and foremost, as stated above, the Proposed Transaction represents an ultimate end goal of maximizing profits for Dell (and its controlling shareholder Defendant Michael S. Dell) which through its wholly-owned subsidy EMC, and its majority owned subsidy VMware, own 63.8% of the Company including 94.6% of the voting stock of the Company.

73.     In addition, Defendant Klevorn, as stated above, is an officer with Ford, a stockholder of approximately 17.5 million shares of Pivotal Software Class A stock, and which has executed a voting agreement pledging to vote those shares in favor of the Proposed Transaction.   Despite the this clear conflict of interest Defendant Klevorn was deemed "independent" enough to serve on the two person independent special committee that ran the sales process.

74.     Certain insiders stand to receive financial benefits as a result of the Proposed Transaction.  Notably, Company insiders, including the Individual Defendants, currently own

large, illiquid portions of Company stock that will be exchanged for large cash pay days upon the consummation of the Proposed Transaction.  While the preliminary proxy reveals the holdings of Company insiders as follows, it fails to adequately describe the specific consideration afforded to each Company insider.

| Name of Beneficial Owner | Number of Shares of Class A Beneficially Owned(1) | Percentage of Shares of Class A Beneficially Owned(1) | Number of Shares of Class B Beneficially Owned(1) | Percentage of Shares of Class B Beneficially Owned(1) | Percentage of Total Voting Power(1) |
|---|---|---|---|---|---|
| **Principal Stockholders:** | | | | | |
| Michael S. Dell(2) | 175,514,272 | 63.8% | 175,514,272 | 100% | 94.6% |
| Dell Technologies Inc.(3) | 175,514,272 | 63.8% | 175,514,272 | 100% | 94.6% |
| EMC Corporation(3) | 175,514,272 | 63.8% | 175,514,272 | 100% | 94.6% |
| EMC Equity Assets LLC(3) | 175,514,272 | 63.8% | 175,514,272 | 100% | 94.6% |
| VMware, Inc.(3) | 175,514,272 | 63.8% | 175,514,272 | 100% | 94.6% |
| Ford Motor Company(4) | 17,516,709 | 17.6% | — | — | * |
| FMR LLC(5) | 14,459,818 | 14.5% | — | — | * |
| The Vanguard Group(6) | 6,807,530 | 6.8% | — | — | * |
| **Named Executive Officers and Directors:** | | | | | |
| Robert Mee(7) | 2,477,469 | 2.4% | — | — | * |
| William Cook(8) | 2,235,850 | 2.2% | — | — | * |
| Scott Yara(9) | 1,750,379 | 1.7% | — | — | * |
| Paul Maritz(10) | 1,013,334 | 1.0% | — | — | * |
| Michael S. Dell(2) | 175,514,272 | 63.8% | 175,514,272 | 100% | 94.6% |
| Zane Rowe | — | — | — | — | — |
| Egon Durban | — | — | — | — | — |
| William D. Green(11) | 63,334 | * | — | — | * |
| Marcy S. Klevorn | — | — | — | — | — |
| Madelyn J. Lankton(12) | 4,152 | * | — | — | * |
| All executive officers and directors as a group (14 persons)(13) | 184,984,457 | 65.1% | 175,514,272 | 100% | 94.7% |

75.    Furthermore, upon the consummation of the Proposed Transaction, each outstanding Company option or equity award, will be canceled and converted into the right to receive certain consideration according to the merger agreement.  Notably, while the Preliminary Proxy reveals that Pivotal Software insiders will receive approximately $82.1 million for their cashed out options and equity awards, it does not sufficiently break down the amount that each individual Company insider will receive.

76.    Moreover, certain employment agreements with certain Pivotal Software executives, entitle such executives to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant

each director or officer entitled to them millions of dollars, compensation not shared by Pivotal Software's common stockholders.  Notably, the Preliminary Proxy does not provide adequate detail regarding the compensation afforded to Company insiders as a result of these Golden Parachute payments.

77.    Thus, while the Proposed Transaction is not in the best interests of Pivotal Software stockholders, it will produce lucrative benefits for the Company's officers and directors.

**The Materially Misleading and/or Incomplete Registration Statement**

78.    On October 10, 2019, the Pivotal Software Board caused to be filed with the SEC a materially misleading and incomplete Preliminary Proxy that, in violation of their fiduciary duties, failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process Leading up to the Proposed Transaction*

79.    Specifically, the Preliminary Proxy fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Proxy fails to disclose:

a.    The Preliminary Proxy fails to disclose sufficient information regarding the specific nature of the confidentiality agreement entered into between Pivotal Software and VMware during the sales process, and if it contained a "don't-ask, don't-waive" or standstill provision, and if so, the specific conditions, if any, under which such provisions would fall away or prevent parties from submitting a bid;

b.    The Preliminary Proxy fails to disclose adequate reasoning for the failure to perform a market check for potentially interested third parties during the sales

process after it became apparent that no go-shop provision would be added to the merger agreement;

c.    The preliminary Proxy fails to disclose the nature and timing of communications regarding future employment;

d.    The Preliminary Proxy fails to provide detailed information regarding the specific compensation afforded to Company insiders for their Company stock, options, stock awards, and change-in-control provisions, as applicable;

e.    The Preliminary Proxy fails to disclose why conflicted members of management were allowed to attend meetings of the Special Committee when those individuals were likewise affiliated with both Dell and VMWare.

*Omissions and/or Material Misrepresentations Concerning Pivotal's Financial Projections*

80.    The Preliminary Proxy fails to provide material information concerning financial projections provided by Pivotal Software's management and relied upon by Morgan Stanley, Lazard, and Moelis in their analyses.  The Preliminary Proxy discloses management-prepared financial projections for the Company which are materially misleading.  Accordingly, the Preliminary Proxy should have, but fails to provide, certain information in the projections that Pivotal Software management provided to the Board and the various financial advisors.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007)

81.    Regarding the "*Initial Outlook*" Company projections, the Preliminary Proxy fails to provide material information concerning the prepared by Pivotal Software management.  Specifically, the Preliminary Proxy fails to disclose the material line items for the following metrics:

a.    The line items used to calculate Non-GAAP Operating Income, including

i.  EBIT and EBITDA

82.   Regarding the "*Base Case*" Company projections, the Preliminary Proxy fails to provide material information concerning the prepared by Pivotal Software management. Specifically, the Preliminary Proxy fails to disclose the material line items for the following metrics:

a.  The line items used to calculate Non-GAAP Operating Income, including

i.  EBIT;

ii.  EBITDA; and

iii.  Unlevered Free Cash Flows

83.   Regarding the "*High Case*" Company projections, the Preliminary Proxy fails to provide material information concerning the prepared by Pivotal Software management. Specifically, the Preliminary Proxy fails to disclose the material line items for the following metrics:

a.  The line items used to calculate Non-GAAP Operating Income, including

i.  EBIT;

ii.  EBITDA; and

iii.  Unlevered Free Cash Flows

84.   As stated above, the Preliminary Proxy provides several non-GAAP financial metrics, EBIT, EBITDA, and unlevered free cash flows, but fails to disclose a reconciliation of all non-GAAP to GAAP metrics, as described above.

85.   This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

86.   Without accurate projection data presented in the Preliminary Proxy, Plaintiff and other stockholders of Pivotal Software are unable to properly evaluate the Company's true worth,

CLASS ACTION COMPLAINT

1  the accuracy of the various financial advisors' financial analyses, or make an informed decision

2  whether to vote their Company stock in favor of the Proposed Transaction.

3  *Omissions and/or Material Misrepresentations Concerning VMware's Financial*

4  *Projections*

5  87.  The Preliminary Proxy fails to provide material information concerning financial

6  projections provided by VMware management and relied upon by the various financial advisors

7  in their analyses.  The Preliminary Proxy should have, but fails to provide, certain information in

8  the projections that VMware management provided to the various financial advisors.  Courts have

9  uniformly stated that "projections … are probably among the most highly-prized disclosures by

10  investors.  Investors can come up with their own estimates of discount rates or [] market multiples.

11  What they cannot hope to do is replicate management's inside view of the company's prospects."

12  *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

13  88.  Regarding the "*VMware Projections*", the Preliminary Proxy fails to provide

14  material information concerning the prepared by VMware management.  Specifically, the

15  Preliminary Proxy fails to disclose the material line items for the following metrics:

16        a.  The line items used to calculate Non-GAAP Operating Income, including

17            i.  Non-GAAAP EBIT

18  89.  Regarding the "*VMware Prepared Pivotal Pro Forma Projections*", the

19  Preliminary Proxy fails to provide material information concerning the prepared by VMware

20  management.  Specifically, the Preliminary Proxy fails to disclose the material line items for the

21  following metrics:

22        a.  The line items used to calculate Non-GAAP Operating Income, including

23            i.  Non-GAAAP EBIT

24  90.  As stated above, the Preliminary Proxy provides several non-GAAP financial

25  metrics, including EBIT, but fails to disclose a reconciliation of all non-GAAP to GAAP metrics,

26  as described above.

27

28

CLASS ACTION COMPLAINT

91.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

92.     Without accurate projection data presented in the Preliminary Proxy, Plaintiff and other stockholders of Pivotal Software are unable to properly evaluate VMware's true worth, the accuracy of the various financial advisors' financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Morgan Stanley*

93.     In the Preliminary Proxy, Morgan Stanley describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

94.     With respect to the *Publicly Traded Comparables Analysis*, the Preliminary Proxy fails to disclose the following:

        a.   The specific benchmark multiples for each analyzed comparable company;

        b.   The specific benchmark multiples for Pivotal Software on a standalone basis.

95.     With respect to the *Discounted Equity Value Analysis*, the Preliminary Proxy fails to disclose the following:

        a.   The specific inputs and assumptions used to calculate the assumed cost of equity of Pivotal Software of 10.0%.

96.     With respect to the *Discounted Cash Flow Analysis*, the Preliminary Proxy fails to disclose the following:

        a.   The specific inputs and assumptions used to calculate the perpetuity growth rates range of 2.5% to 3.5%;

CLASS ACTION COMPLAINT

      b.  The specific inputs and assumptions used to calculate the discount rates range of 9.0% to 11.0%;

      c.  Pivotal Software's estimated weighted average cost of capital.

97.    With respect to the *Precedent Transaction Analysis*, the Preliminary Proxy fails to disclose the following:

      a.  The specific date on which each selected transaction closed;

      b.  The value of each selected transaction;

      c.  The specific benchmark multiples for Pivotal Software on a standalone basis.

98.    These disclosures are critical for stockholders to be able to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

## FIRST COUNT

### Claim for Breach of Fiduciary Duties

### (Against the Individual Defendants)

99.    Plaintiff repeats all previous allegations as if set forth in full herein.

100.    The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff and the Company's public stockholders.

101.    By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Pivotal Software.

102.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of Pivotal Software by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of Pivotal Software to its public stockholders.

103.    Indeed, Defendants have accepted an offer to sell Pivotal Software at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

104.    Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

105.    The Individual Defendants dominate and control the business and corporate affairs of Pivotal Software, and are in possession of private corporate information concerning Pivotal Software's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Pivotal Software which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

106.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

107.    As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Pivotal Software's assets and have been and will be prevented from obtaining a fair price for their common stock.

108.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

109.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

**SECOND COUNT**

**Aiding and Abetting the Board's Breaches of Fiduciary Duty**

**Against Defendants Pivotal Software,**

**<u>VMWare and Merger Sub Inc.</u>**

110.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

111.   Defendants Pivotal Software, VMWare, and Merger Sub, knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Acquisition, which, without such aid, would not have occurred.

112.   As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

113.   Plaintiff and the members of the Class have no adequate remedy at law.

### THIRD COUNT

### Violations of Section 14(a) of the Exchange Act

### (Against All Defendants)

114.   Plaintiff repeats all previous allegations as if set forth in full herein.

115.   Defendants have disseminated the Preliminary Proxy with the intention of soliciting stockholders to vote their shares in favor of the Proposed Transaction.

116.   Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

117.   As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading

118.    The Preliminary Proxy was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Preliminary Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

119.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

120.    The Individual Defendants were at least negligent in filing a Preliminary Proxy that was materially misleading and/or omitted material facts necessary to make the Preliminary Proxy not misleading.

121.    The misrepresentations and omissions in the Preliminary Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of its entitlement to decide whether to vote its shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## FOURTH COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants)

122.    Plaintiff repeats all previous allegations as if set forth in full herein.

CLASS ACTION COMPLAINT

123.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Preliminary Proxy was materially misleading to Company stockholders

124.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Preliminary Proxy and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Preliminary Proxy.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Preliminary Proxy before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

125.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Pivotal Software's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the Preliminary Proxy was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the Preliminary Proxy and are therefore responsible and liable for the misrepresentations contained herein.

126.    The Individual Defendants acted as controlling persons of Pivotal Software within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Pivotal Software to engage in the

wrongful conduct complained of herein.  The Individual Defendants controlled Pivotal Software and all of its employees.  As alleged above, Pivotal Software is a primary violator of Section 14 of the Exchange Act and SEC Rule 14A-9.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act

WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class, and against the Defendants, as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.      Enjoining the Proposed Transaction;

C.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

E.      Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Pivotal Software and obtain a transaction which is in the best interests of Pivotal Software and its stockholders;

F.      Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

G.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

H.      Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: October 21, 2019

**BRODSKY & SMITH, LLC**

By: _____

Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9595 Wilshire Blvd., Ste. 900
Phone:  (877) 534-2590
Facsimile (310) 247-0160

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT